## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARIA NERON,           )
    *Plaintiff,*       )
                )    CASE NO. 3:22-cv-469 (OAW)
   v.           )
                )
AMEDISYS HOLDING, LLC,  )
    *Defendant.*      )
                )
                )

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS ACTION** is before the court upon Defendant's Motion for Summary Judgment. ECF No. 40. Defendant Amedisys Holding, LLC provides home health care services for its clients. Plaintiff worked as the Director of Operations for Defendant's Hamden, Connecticut office. In December 2020, Plaintiff was terminated for committing a company policy violation deemed a terminable offense. Approximately one month before her termination, Plaintiff informed her supervisors that her mother was diagnosed with cancer. Plaintiff alleges that Defendant unlawfully terminated her because of her association with her mother's cancer in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. ("CFEPA"); interfered with and retaliated against her for attempting to take medical leave under the Family Medical Leave Act of 1993, 42 U.S.C. § 12101 et seq. ("FMLA"); and for exercising her free speech rights under Conn. Gen. Stat. § 31-51q. The court has reviewed the motion, Defendants' opposition to the motion, ECF No. 45, Plaintiff's reply in support of the motion, ECF No. 48, and the record in this case. For the reasons discussed herein, the motion is **GRANTED.**

## I.  BACKGROUND

Defendant provides home health care services to patients throughout Connecticut. *See* Compl. ¶ 4, ECF No. 1-1; Am. Ans. ¶ 4, ECF No. 39; Pl.'s 56(a)(2) Stmt. ¶ 1, ECF No. 45-2.  In June 2017, Defendant hired Plaintiff, a licensed Registered Nurse, as the Director of Operations of its Care Center in Hamden.  Pl.'s 56(a)(2) Stmt. ¶ 2.  As the Director of Operations, Plaintiff was the highest-ranking employee and in charge of the Care Center's overall performance, including through patient census management, referral review, billing and financial oversight, and periodic patient visits.  *Id.* ¶ 5.  Plaintiff was required to make sure the Care Center complied with all federal and state laws, regulations, policies, and procedures.  *See id.* ¶ 6.  Plaintiff's direct supervisor was Vice President of Operations Indy Edwards, and her indirect supervisor was Area Vice President of Operations, Mary Gleason.  *See id.* ¶ 7.

### A.  Relevant Events

In early November 2020, Plaintiff learned that her mother, who lived in Florida at the time, was diagnosed with cancer.  *See id.* ¶¶ 45–47.  Immediately upon learning of her diagnosis, her mother decided to relocate to Connecticut so that Plaintiff could take care of her.  *See* Def.'s Ex. B, Neron Dep. at 137:11–138:17, ECF No. 41-2.  Plaintiff was in the Hamden office when she learned of the diagnosis, and both Edwards and Gleason were present.  *See id.*  Edwards—who had personally "gone through it"—told Plaintiff the experience would be "challenging and difficult."  *Id.* at 125:19–22.  Plaintiff testified that Gleason was "very sympathetic and very caring,"  and she regularly asked how Plaintiff's mother was doing.  *Id.* at 125:19–22, 126:25–127:1.

On Friday, November 13, 2020, a physician issued a "verbal order" for one of Defendant's skilled nurses to visit a patient's home.  *Id.* ¶ 21.  The order included the placement of an extension tube on the patient's central catheter line ("PICC line").  *See id.*  The purpose of the extension tube is to make the access point to the PICC line reachable by the patient, which enables the patient to access and manage her own infusions. *See id.* ¶¶ 21–22.  After the "verbal order" was placed, Defendant scheduled a nurse (Tiffany, last name unknown) to visit the patient at her home in Greenwich on Saturday, November 14.

Tiffany did not visit the patient's house as scheduled.  *See id.* ¶ 23.  The patient called Defendant's on-call service and spoke to Plaintiff, informing her that "her extension tubing was not connected to her PICC line."  *See id.*; Def.'s Ex. B, Neron Dep. at 83:18–8.  Plaintiff attempted to reach Tiffany several times over the course of three hours but did not reach her.  *See* Pl.'s 56(a)(2) Stmt. ¶¶ 23–25.

Coincidentally, Plaintiff's mother was scheduled to arrive at John F. Kennedy International Airport that Saturday afternoon.  *See id.*  Plaintiff began driving south to pick up her mother from the airport, and at some point during the drive Plaintiff decided to make a stop at the patient's home.  *See id.*  She did not bring the patient's chart or her tablet or anything else that an employee would normally bring to a patient visit.  *See* Def.'s Ex. B, Neron Dep. at 93:16–24.  Plaintiff arrived at the patient's house, washed her hands, attached the extension tube to the PICC line, opened the patient's sterile intravenous line, bled the extension tube, and cleaned the site.  *See* Pl.'s 56(a)(2) Stmt. ¶¶ 26–27.  Plaintiff did not do a full assessment, which would have included taking vital signs, talking to the patient, assessing the patient's physical and mental conditions to determine if there are

issues, and re-educating the plaintiff on extension tube use and cleanliness. *See* Def.'s Ex. B, Neron Dep. at 89:2–25. Plaintiff then left to pick up her mother at the airport. *See* Pl.'s 56(a)(2) Stmt. ¶¶ 26–27.

The following Monday, Plaintiff informed Office Manager Donna Hunt and Scheduler Melissa Smith that she visited the patient's house on Saturday. *See id.* ¶ 28; Def.'s Ex. H, Hunt Stmt., ECF No. 41-8. Plaintiff instructed Smith and/or Hunt to mark the patient's visit as a "missed visit." *See id.*; Pl.'s 56(a)(2) Stmt. ¶ 28. Plaintiff understood "missed visit" to mean a visit that is scheduled but not completed. *See* Pl.'s 56(a)(2) Stmt. ¶ 29. It turned out that Hunt did not mark the visit as "missed" because she felt it was improper to do so. *See id.* ¶ 30.

On December 1, 2020, Plaintiff was completing missed visit reports. *See* Def.'s Ex. B, Neron Dep. at 109:14–20. Hunt and Smith requested that Plaintiff make a missed visit report for the November 14 patient visit. *See id.* at 100:7–8, 109:14–20. Plaintiff then discovered that Smith had reassigned the visit to her, instead of Tiffany. *See id.* at 110:2–15. Plaintiff testified their failure to mark the visit as "missed" was an error, because "Tiffany missed her visit," explaining: "I didn't do a visit…. I stopped there to help the patient connect the tubing that she could not reach. That was it. It had nothing to do with a visit." *Id.* at 112:2–11. Plaintiff then completed the report and marked the visit as "missed." *Id.*

Two days later, Plaintiff discussed the FMLA leave process with Hunt. *See id.* at 128:17–131:2. Plaintiff needed to take leave because her mother had an upcoming all-day appointment. *See id.* Hunt informed her that she needed to bring forms to the appointment for the physicians' signatures. *See id.* Hunt also informed Plaintiff to contact

the Human Resources Department ("HR").  *See id.*  Plaintiff did not contact HR, because it was her understanding she "had until mid December to get the forms."  *See id.*

The following week, on December 8, Hunt informed Edwards that Plaintiff marked the November 14 visit as "missed."   *See* Pl.'s 56(a)(2) Stmt. ¶ 32.  That day, Edwards reviewed the physician's November 13 "verbal order" and Plaintiff's missed visit report, and then she consulted with Employee Relations Consultant, Christine Hazlip.  *See id.* ¶ 33.  Defendant suspended Plaintiff pending investigation into her suspected failure to properly document the patient visit.  *See id.*  Defendant requested that Plaintiff and Hunt make written statements for the investigation.  *See id.* ¶ 34.

Hunt e-mailed her written statement to Edwards at 2:50 PM on December 8, stating that Plaintiff twice instructed Smith to mark the November 14 visit as "missed."  *See* Def.'s Ex. H, Hunt Stmt.  According to Hunt, Plaintiff stated during a meeting that the visit should be marked as missed, explaining, "I am not transmitting that, I only went because Tiffany fell asleep and I was not there that long."  *Id.*  Edwards submitted a declaration stating, "Ms. Hunt told me that Plaintiff instructed her to mark the November 14, 2020, patient visit as 'missed' because Plaintiff did not want to 'go into her tablet' because she did not 'even know where [her] tablet [wa]s."  Def.'s Ex. A, Edwards Decl. ¶ 11, ECF No. 41-1.

At 4:50 PM that afternoon, Plaintiff e-mailed her written statement.  *See id.* ¶ 35. In relevant part, Plaintiff explained,

> I stopped by the patient's home and assisted to connect her tubing, and she was able to infuse her IV.  I did not conduct a full visit as per Amedisys policy, and therefore entered a missed visit note.  However, I did evidently forget to enter a CC note to document that I connected the extension tube for the patient.  I have entered a late entry into the patient chart as of this time to correct the documentation.

Def.'s Ex. G, Neron Stmt., ECF No. 41-7.

After reviewing the relevant documents and speaking with both Plaintiff and Hunt, Edwards decided to terminate Plaintiff on December 14, 2020.  *See* Pl.'s 56(a)(2) Stmt. ¶¶ 41–42.  Edwards made this decision after consulting with the HR and Compliance Departments.  *Id.*  The record contains the separation form, which indicates the reason for separation is Plaintiff committed a Critical Offense Violation: "Falsifying any company document."  Def.'s Ex. I, Separation Ltr., ECF No. 41-9.  Additionally, the form stated:

> On 11/14/2020, Maria made a PRN visit to patient [ ] in which she added extension tubing to a PICC line, requiring opening a closed system, flushing it, and attaching it.  Maria failed to see the importance of accurately documenting the nursing intervention done while in the home and instead completed a missed visit note several weeks later.  Additionally, Maria failed to complete a full assessment of the patient during the visit, per MD order.

*Id.*  Plaintiff is unaware of any other Director of Operations who were accused of similar conduct but not terminated.  *See* Pl.'s 56(a)(2) Stmt. ¶ 57.

Plaintiff never consulted Defendant's FMLA policy.  *See id.* ¶ 58.  Plaintiff testified that—at some point in early December—she told Gleason she might need to take FMLA leave.  *See* Def.'s Ex. B, Neron Dep. at 127:15–128:7.  Specifically, Plaintiff testified that she told Gleason: "Things were getting challenging.  I tried to do work and do the appointments in between work.  And the appointments were building up.  And I was going to look into FMLA."  *Id.*  Plaintiff does not believe Gleason told anyone she was interested in taking FMLA.  *See id.*  Edwards denies being told Plaintiff intended to take FMLA leave. *See* Def.'s Ex. A, Edwards Decl. ¶ 14.

## B.  Defendant's Policies

Defendant maintains a Policy Manual, which it provided Plaintiff five times throughout her employment.  Pl.'s 56(a)(2) Stmt. ¶ 10.  In relevant part, the Policy Manual contains information about compliance—including corporate compliance rules,

antidiscrimination rules, workplace rules of conduct, and terminable conduct—and procedure for taking leaves of absence. *See* Def.'s Ex. D, Amedisys Policy Manual at 2, ECF No. 41-4.

As stated in the Policy Manual, Defendant Corporate Compliance Program adopts a "zero tolerance" philosophy for violations of its standards of conduct. *See id.* at 3. Section 1.15 of the Policy Manual enumerates a "non-exhaustive list of unacceptable behaviors" known as Critical Offense Violations which include, in relevant part, "[f]alsifying any Company document." *Id.* at 13. Critical Offense Violations "will ordinarily result in immediate separation from employment." *Id.* All employees are obligated to report instances of another employee's corporate compliance violation. *See id.* This provision further states, "If any employee has concerns about the integrity of the care and services delivered and/or claims or billing processes, it is his/her obligation to bring these matters to the attention of his/her supervisor, the Company's Chief Compliance Officer or a member of the Corporate Compliance Committee." *Id.* The Code of Ethical Business Conduct (Appendix 1) outlines a Five-Step Program for an employee to follow if she has "a question about legal or ethical issues that arise in the performance of [the] job." *Id.* at 45. This Code also provides a Compliance Hotline phone number, which is anonymous and cannot be traced. *See id.*

Apart from compliance issues, the Policy Manual also explains the procedure for taking leave under the FMLA to care for a family member with a serious health condition. *See id.* at 22–24. An employee must provide Defendant 30 days' notice for "foreseeable leave" such as "planned medical treatment." *Id.* at 23. When the leave is unforeseeable, an employee is "required to provide as much notice as practicable prior to the leave" and

must give "sufficient information for the Company to reasonably determine whether the Family and Medical Leave Act may apply." *Id.* To support the FMLA leave request, the employee's health care provider must complete a medical certification. *See id.* The Policy Manual includes a link to the specific PDF as well as an e-mail address, which it directs the employee to contact with questions. *See id.*

Because Defendant provides Medicare-reimbursed services, the Center for Medicaid & Medicare Services ("CMS") requires it to follow strict clinical procedures for documenting and maintaining clinical records. *See* Pl.'s 56(a)(2) Stmt. ¶ 15. Defendant implemented internal procedures to effectuate applicable CMS regulations; it submitted two of them as exhibits, and each of the two pertains to medical record documentation. *See id.* ¶¶ 16–19.

Defendant's Exhibit E sets forth the required content in clinical records. Def.'s Ex. E, Clinical Record Content Policy, ECF No. 41-5. In relevant part, the applicable regulation requires all home health agencies to document "[a]ll interventions, including medication administration, treatments, and services, and responses to those interventions." *Id.* at 1. For home visits, "[t]he patient visit begins when the home health caregiver enters the patient's home and ends when the Home Health Caregiver leaves the patient's home, meaning that when they complete the patient visit – this ends the visit." *Id.* at 3. The policy sets a 7-day deadline to submit the required documentation after a patient visit, and e-mail communication suffices as proper documentation. *See id.*

Defendant's Exhibit F establishes a detailed list of information that must be documented when completing infusion therapy. Def.'s Ex. F, Documentation of Infusion Therapy Policy, ECF No. 41-6. In general, a clinician must provide evidence of the

specific treatment; documentation of assessment, medication (past and present), and guidelines for future care; a record of client/caregiver training; documentation of the required care and skills needed to provide such care; an "[a]ppropriate assessments, interventions and treatments during therapy." *Id.* at 1.  Plaintiff acknowledged during her deposition that she is required to document all treatments and interventions she provides to a patient.  *See* Pl.'s 56(a)(2) Stmt. ¶ 20.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.*  The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs.*, 781

F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)).  Instead, the party opposing summary judgment must set forth in its response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

At summary judgment, the judge's function is "not to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue" of material fact best left for determination by a jury at trial.  *Anderson*, 477 U.S. at 249.

III.   **DISCUSSION**

Plaintiff's Complaint includes seven causes of action: disability, age and race discrimination in violation of the CFEPA (Counts One through Three); FMLA interference and retaliation (Counts Four and Five); a statutory violation of free speech claim under Conn. Gen. Stat. § 31-51q (Count Six); and a common law public policy claim (Count Seven).  Defendant moves for summary judgment on all counts and Plaintiff does not contest the granting of summary judgment on the age discrimination, race discrimination, and common law wrongful discharge claims.  *See* Opp'n at 1 n.1.  For the reasons stated in Defendant's briefing and in light of the evidence in the record, the court finds Defendant

meets its burden under Rule 56 of the Federal Rules of Civil Procedure.  Therefore, Summary Judgment is **GRANTED** as to Counts Two, Three, and Six.  The court now turns to Plaintiff's FMLA leave, disability discrimination, and free speech claims, seriatim.

### A.  <u>FMLA Claims</u>

The FMLA entitles an eligible employee to take leave from work to care for a parent with a "serious health condition."  29 U.S.C. § 2612(a)(1)(C).  After taking FMLA leave, an employee has the right "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to "an equivalent position."  29 US.C. § 2614(a)(1).  Section 2615(a)(1) of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" the employee's FMLA rights.  29 U.S.C. § 2615(a)(1).

Defendant argues that summary judgment should be granted on both the FMLA interference and retaliation claims for the same two reasons.  First, Defendant argues that it was not aware of Plaintiff's need for FMLA leave.  *See* Summ. J. Mem. at 15, ECF No. 42.  Second, Defendant argues there is no evidence that it considered Plaintiff's FMLA needs in its decision to terminate her.  *See id.* at 18.  Plaintiff takes issue with grouping the claims together and challenges Defendant's arguments as applied to the specific claims.

Subsection (a)(1) of § 2615 is the source of both FMLA claims raised by Plaintiff. As the United States Court of Appeals for the Second Circuit explained in *Woods v. START Treatment & Recovery Centers., Incorporated*, 864 F.3d 158, 166, 167 (2d Cir. 2017), prohibited conduct under § 2615(a)(1) can "come in at least two varieties:

interference and retaliation."[1]  The former claim is an ex-ante protection, meaning it arises when the "employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA."  *Id.*  The latter claim functions as an ex-post protection, because it "involve[s] an employee actually exercising her rights … under the FMLA and then being subjected to some adverse employment action by the employer."  *Id.*

An employer who violates § 2615(a)(1) is liable to an eligible employee for damages equal to "any wages, salary, employment benefits, or other compensation denied or lost to such employee *by reason of the violation*."  29 U.S.C. § 2617(a)(1)(A)(i)(I) (emphasis added).  The Supreme Court of the United States clarified that this language means, "§ 2617 provides no relief unless the employee has been prejudiced by the violation."  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see Blodgett v. 22 S. Street Operations, LLC*, 828 F. App'x 1, 5 (2d Cir. 2020) (stating "a litigant must show that the violation was prejudicial" to succeed in an FMLA interference claim).

## 1. *FMLA Interference*

In the interference context, a plaintiff must establish the FMLA interference elements and then show that she was prejudiced by such interference.  *See Ragsdale*, 535 U.S. at 89; *Roberts v. Health Ass'n*, 308 Fed. App'x. 568, 569 (2009).  The elements of an FMLA interference claim are: "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the

---

[1] The Department of Labor's regulatory guidance similarly incorporates retaliation for exercising FMLA rights into the FMLA's interference provision.  *See* 29 C.F.R. § 825.220(c) ("The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights.").

FMLA." *Graziadio v. Culinary Institute of Am.*, 817 F.3d 415, 424 (2d Cir. 2016).  The court does not address these elements, because—even if they were satisfied—Plaintiff has not presented any evidence showing prejudice.[2]

To establish prejudice, a plaintiff must do more than simply show she was not reinstated.  While the Second Circuit has not explicitly addressed the issue, other circuit courts and courts within this circuit have held that an employer may discharge an employee who has requested or taken FMLA leave so long as the reason is independent from FMLA  leave.  *See, e.g., Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 831 (11th Cir. 2015) (stating "an employer can deny reinstatement following FMLA leave if it can demonstrate that it would have discharged the employee even if he had not been on FMLA leave"); *Nagle v. Acton-Boxborough Reg'l Sch. Dist.*, 576 F.3d 1, 3 (1st Cir. 2009) ("Where an employee properly takes FMLA leave, the employee cannot be discharged for exercising a right provided by the statute, but can still be discharged for independent reasons."); *DeAngelo v. Yellowbook, Inc.*, 105 F. Supp. 3d 166, 182 (D. Conn. 2015) ("Because taking FMLA leave does not create an absolute entitlement to an employment position, *see* 29 U.S.C.A. § 2614(a)(3)(B), DeAngelo's position was not immune from termination for disciplinary reasons merely because he requested leave."); *Pearson v.*

---

[2] In arguing that it was not aware of Plaintiff's need for FMLA leave, Defendant appears to be challenging the notice element.  To evaluate the sufficiency of Plaintiff's notice, the court must assess the applicable Department of Labor regulations to determine "what kind of notice [the plaintiff] was  required to provide." *Coutard v. Municipal Credit Union*, 848 F.3d 102, 109 (2d Cir. 2017).  The regulations separate the employee's notice obligations into two general categories: foreseeable and unforeseeable FMLA leave. *Compare* 29 C.F.R. § 825.302 (foreseeable leave) *with* 29 C.F.R. § 825.303 (unforeseeable leave). Defendant does not brief which regulation Plaintiff failed to satisfy and does not explain how Plaintiff failed to follow its notice procedure.  Plaintiff testified that she informed Hunt, the office manager, of her need to take leave for her mother's all-day appointment.  *See* Def.'s Ex. B, Neron Dep. at 128:17–131:11. Defendant does not provide evidence contradicting Plaintiff's deposition testimony.  Nor does Defendant provide Hunt's job duties as the office manager, instead assuming without providing legal authority or evidence Plaintiff must inform her supervisor (as opposed to HR or another employee in leadership).  The court presumes without deciding that Plaintiff would satisfy the notice requirement.

*Unification Theological Seminary*, 785 F. Supp. 2d 141, 161 (S.D.N.Y. 2011) ("[I]t is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave."); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) (stating "FMLA is not a shield" for employees who are otherwise subject to "legitimate disciplinary action" that is "unrelated to their FMLA leave") (citation omitted).   As this court previously explained, "This rule is the result of common sense; it cannot be the case that an employer, having approved an employee's request for FMLA leave, becomes categorically precluded from terminating that employee even for valid reasons without giving rise to an interference claim." *Waltman v. United Servs., Inc.*, 635 F. Supp. 3d, 109–10 (D. Conn. 2022).   The same reasoning certainly applies when an employer discovers terminable conduct before the plaintiff formally asks for and/or takes leave.

Here, the undisputed evidence establishes that Plaintiff was terminated for committing a Critical Offense Violation.   On November 14, 2020, Plaintiff visited a client after the assigned nurse failed to show up, attached an extension tube to the client's PICC line in partial compliance with the physician's order, and then weeks later documented the event as a "missed visit."   *See* Pl.'s 56(a)(2) Stmt. ¶¶ 21–32.   Plaintiff's supervisor, HR, and the Compliance Department determined Plaintiff's conduct constituted a Critical Offense Violation—"falsifying any company document"—warranting immediate termination.   *Id.*   ¶¶ 41–42; Def.'s Ex. I, Separation Ltr.   Defendant explained in the termination form: "Maria failed to see the importance of accurately documenting the nursing intervention done while in the home and instead completed a missed visit note several weeks later.   Additionally, Maria failed to complete a full assessment of the patient

during the visit, per MD order."  Def.'s Ex. I, Separation Ltr.  Plaintiff admits that she was required to document all treatments and interventions but did not do so here.  *See* Pl.'s 56(a)(2) Stmt. ¶¶ 20, 34.

Plaintiff is steadfast in her belief that she need not have documented the visit, because she did not perform a "skilled nursing visit."  Def.'s Ex. B, Neron Dep. at 102:1–14.  She maintains that she merely "assisted [the client] to connect the tubing," a task which she contends a "caregiver" or a "friend" could have completed.  *Id.*  However, the applicable regulation in Defendant's Policy on Clinical Records, Contents requires an employee to document "*[a]ll interventions*, including medication administration, treatments, and services" when visiting a patient's home and to do so within seven days.  Def.'s Ex. E, Clinical Record Content Policy at 1 (emphasis added).  A "patient visit begins when the home health caregiver enters the patient's home and ends when the Home Health Caregiver leaves the patient's home…."  *See id.* at 3.  In other words, there was no option for Plaintiff *not* to document her visit to the client's house and the treatment, however minimal, that she performed.  Furthermore, Plaintiff did not just fail to document the visit—she consciously chose to mark it as a "missed visit."  Her actions constitute a clear violation of the Policy Manual.

This situation is similar to *Waltman v. United Services, Incorporated*, 635 F. Supp. 3d 86 (D. Conn. 2022).  There, the plaintiff worked as a crisis clinician for a non-profit employer that provided mental health and social services.  Plaintiff was diagnosed with lupus and received FMLA leave, but she was terminated when her employer discovered she disclosed her client's protected health information to a government official and reentry program without obtaining the client's signed release.  *See id.* at 100–02.  As in the instant

case, the parties largely agreed about the facts, but disagreed about whether they constituted legal or policy violations (and thus, whether they formed a terminable offense). *See id.* at 102.  Ultimately, the plaintiff failed to present direct evidence that her firing was motivated by her exercise of FMLA rights and instead relied on her subjective belief that her employer resented her use of medical leave.  *See id.* at 105–06.  The court granted summary judgment in the defendant's favor, reasoning that the plaintiff's "subjective belief that she was not in violation of United Services' policies or federal or state law does not excuse her action."[3]  *Id.* at 106.  And, also like the present case, this was especially true because her subjective but incorrect belief could have jeopardized the employer's programs, funding, and ability to serve clients.  *See id.*

The parties do not dispute that Plaintiff was trying to do what was best for her client, as was the case in *Whitman*.  But this does not mean that Defendant interfered with her FMLA rights.  In the end, the evidence establishes that Plaintiff committed a policy violation warranting termination.  There is nothing in the record that shows Defendant considered Plaintiff's need for FMLA leave when it terminated her.  Therefore, summary judgment is **GRANTED** as to Count Four.

## 2.  *FMLA Retaliation*

Moving on to the FMLA retaliation claim, the outcome is the same.  When a plaintiff alleges retaliation for exercising her FMLA rights, the well-known *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework applies.  *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004).  To establish a *prima facie* case of FMLA retaliation, a plaintiff must first show 1) she "exercised rights protected under the

---

[3] While this reasoning was set forth in the FMLA retaliation section, the court granted summary judgment on the FMLA interference claim on the same legal grounds.  *See id.* at 110.

FMLA;" 2) she "was qualified for [her] position;" 3) she "suffered an adverse employment action;" and 4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429.  When a plaintiff satisfies this initial burden, the defendant is called upon to provide a legitimate, non-discriminatory reason for the termination.  *See id*.  If the defendant meets this burden, the plaintiff must then show the reason is pretextual.  *See id*.

Because Plaintiff discussed FMLA leave with Hunt and Gleason in early December and was terminated within a few short weeks, the court presumes without deciding that she establishes a prima facie case.  *See Waltman*, 635 F. Supp. 3d at 101.  Ultimately, Plaintiff's FMLA retaliation claim still fails for the same reason as did her FMLA interference claim.  That is, Defendant legitimately terminated her for violating its policies (which potentially implicated federal and state law), and she has submitted no evidence that it considered her FMLA leave whatsoever in its decision-making process.  *See id*.  Summary judgment therefore is **GRANTED** as to Count Five.

## B. Associational Disability

Plaintiff's associational disability claim fares no better.  To start, the parties brief the associational disability claim in the context of the Americans with Disabilities Act of 1990, but Plaintiff actually brings the claim under the CFEPA.  As the court pointed out last year in *Blake v. Recovery Network of Programs, Incorporated*, 655 F. Supp. 3d 39, 48 (D. Conn. 2023), the statutory language is quite different when it comes to associational disability claims: the ADA explicitly protects employees from discrimination based on "the known disability of an individual with whom the qualified individual is known to have a relationship," 42 U.S.C. § 12112(b)(4), but the CFEPA does not.  *See* Conn.

Gen. Stat. § 46a-60(b)(1) (prohibiting discrimination "because of" the employee's "present or past history of mental disability, intellectual disability, learning disability, physical disability"). Because neither the Supreme Court of Connecticut nor the Connecticut Appellate Court has addressed associational disability claims, the court in *Blake* did not extend associational disability protections from the ADA to the CFEPA. *See id.* at 50.

The parties do not ask this court to address the discrepancy between the two statutes, so it will not. Even if  the CFEPA were to protect employees from associational disability discrimination, Plaintiff's claim would fail because she has produced nothing other than her subjective belief that Defendant terminated her because it was understaffed, she "was going to need to take care of her" mother, responsibility in her absence would fall on Edwards and Gleason, and the November 14 incident was a "good reason to get rid of somebody that was going to be out." Def.'s Ex. B, Neron Dep. at 134:12–135:4. As explained above, Plaintiff's failure to document her treatment of the Greenwich client and her subsequent decision to document the visit as "missed" is a legitimate, non-discriminatory reason for termination. *See Graziadio*, 817 F.3d at 432 (applying *McDonnell Douglas* to ADA associational disability claim). Plaintiff cannot survive summary judgment by relying solely on speculation or conjecture. *Robinson*, 781 F.3d at 44; *Fletcher*, 68 F.3d at 1456. Therefore, as to Plaintiff's associational disability claim brought under the CFEPA, summary judgment is **GRANTED.**

### C.  Free Speech

Section 31-51q of the General Statutes of Connecticut makes it unlawful for an employer to terminate an employee for exercising her free speech rights under the First Amendment of the United States Constitution or § 4 of the first article of the Connecticut

Constitution, "provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer."  Conn. Gen. Stat. § 31-51q(b)(1).  The statute protects both public and private employees, imposes liability on public and private employers, and extends to public and private workplaces.  *See Cotto v. United Tech. Corp.*, 251 Conn. 1, 6, 8–9 (1999).  While neither Connecticut's Supreme nor Appellate Court has enumerated specific elements, courts in this district require a plaintiff to establish that: 1) she "engaged in constitutionally protected speech," 2) the employer subjected her to an "adverse action," and 3) "there was a causal connection" between her protected speech and the adverse action.  *Mumma v. Pathway Vet Alliance, LLC*, 648 F. Supp. 3d 373, 387 (D. Conn. 2023) (citing cases).

Beginning with the first element, the federal and state constitutions offer different levels of free speech protections to employees.  The Constitution of the United States protects an employee's speech only if "made as a citizen on matters of public concern," which is defined as topics of "political, social or other concern to the community."  *Connick v. Myers*, 461 U.S. 138, 146 (1983).  The Connecticut Constitution's protections are even broader: an employee also is protected from retaliation if she makes a "comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety…."  *Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 216–17 (2015) (adopting *Garcetti v. Ceballos*, 547 U.S. 410, 435 (2006) (Souter J., dissent)).

When it comes to the first element of a § 31-51q claim, typically it is presumed that the employee speaks (or refuses to), and so the court must decide whether the *content* of the employee's speech is protected.  This case is unique insofar as Defendant argues

that Plaintiff failed to "speak" in the first place.  *See* Summ. J. Mem. at 19.  The purported speech at issue is Plaintiff's completion of a missed visit report regarding her visit to a client's house on November 14, 2020.  Plaintiff argues she was insisting on the proper documentation of a missed visit so that Medicare could be billed properly.  *See* Opp'n at 21–22.

The court agrees with Defendant.  The First Amendment "embodies our profound national commitment to the free exchange of ideas."  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (internal quotation marks and citations removed); *see State v. Billings*, 217 Conn. App. 1, 25 (Conn. App. Ct. 2022) (same).  "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Ashcroft*, 535 U.S. at 573.  Indeed, speech is defined as the expression of opinion, thought, or commentary.  *See Speech*, Merriam-Webster's   Online   Dictionary,   available   at   https://www.merriam-webster.com/dictionary/speech (last visited Mar. 12, 2024) (defining "speech" as "the communication or expression of thoughts in spoken words"); *Speech*, Black's Law Dictionary (11th ed. 2019) (defining "speech" as the "expression or communication of thoughts or opinions in spoken words; something spoken or uttered").  Courts interpreting "free speech" jurisprudence, including for private employees, define "speech" as synonymous with "expression" or "commentary."  *See, e.g., Trusz*, 319 Conn. at 216–17 ("comment"); *see also Connick*, 461 U.S. at 146 ("expression"); *Cotto*, 241 Conn. at 17 ("expression of opinion").

Here, Plaintiff testified that she completed a missed visit report because she believed that she was required to do so, given that Hunt and Smith failed to follow her

instructions.  *See* Def.'s Ex. B, Neron Dep. at 100:7–8,109:14–110:15, 112:2–11.  When her supervisor suspended her and asked her to write a statement about the incident, Plaintiff did not raise any concerns about Medicare or billing.  Instead, she wrote (in relevant part), "I did not conduct a full visit as per Amedisys policy, and therefore entered a missed visit note."  Def.'s Ex. G, Neron Stmt. at 000059.  During her deposition, Plaintiff was asked about the speech on which her § 31-51q claim was based, and she testified: "I don't recall at the moment."  Def.'s Ex. B, Neron Dep. at 151:1–5.  Given this evidence, the court concludes the missed visit report lacks a message, ideas, subject matter, or content warranting free speech protection.  *See Ashcroft*, 535 U.S. at 573.  In other words, Plaintiff did not "*comment* on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety."  *Trusz*, 319 Conn. at 216 (emphasis added).  For the same reasons that she cannot establish protection by the (broader) state constitution, she fails to show entitlement to federal constitutional protections, as well.

In any event, § 31-51q is limited insofar as an employer may discharge an employee who exercises her free speech rights if the speech "substantially or materially interfere[s] with the employee's bona fide job performance or the working relationship between the employee and the employer."  Conn. Gen. Stat. § 31-51q(b)(1).  For the reasons explained above, Defendant has established such substantial or material interference.[4]  Based on Plaintiff's failure to document the treatment she performed on her client—including by marking the visit as "missed" more than two weeks late—Defendant determined she violated company policy, potentially implicating federal and

---

[4] As explained in *Mumma*, 648 F. Supp. 3d at 389, state and federal courts have placed the burden on the defendant to prove the affirmative defense of "interference," and on the plaintiff to prove the lack thereof. This court need not address this issue, because Defendant has presented sufficient evidence.

state law.  Her lack of knowledge about Defendant's policy could lead Defendant to conclude her actions "substantially or materially interfered" with her job given that she was in charge of the Care Center's compliance with all federal and state laws, regulations, policies and procedures.  *See* Pl.'s 56(a)(2) Stmt. ¶ 6.  Furthermore, Defendant's determination that she used "poor judgment" with respect to a patient is tantamount to the destruction of the company's working relationship with its highest-level employee at the Hamden office.  Therefore, summary judgment is **GRANTED** as to Count Six.

## IV.   CONCLUSION

Accordingly, it is thereupon **ORDERED AND ADJUDGED** that summary judgment is **GRANTED** in favor of Defendant on all counts.  The Clerk of Court respectfully is directed to enter judgment in Defendant's favor and to please close this case.

**IT IS SO ORDERED** in Hartford, Connecticut, this 12th day of March, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE